# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DESHAWN GONSALVES, )<br>)<br>Defendant. )<br>_____) | Criminal Action No. 19-cr-0011 |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Michael A. Rogers, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Deshawn Gonsalves' ("Defendant") Motion to Suppress ("Motion") (Dkt. No. 26); the Government's Opposition thereto (Dkt. No. 29); the evidence and arguments presented at the suppression hearing; and the parties' supplemental memoranda and their respective responses thereto (Dkt. Nos. 40, 41, 43, 44). For the reasons discussed below, the Court will deny Defendant's Motion to Suppress.

### I.  BACKGROUND

On May 21, 2019, Defendant was charged with the following counts in an Amended Information: (1) Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) Possession of a Firearm in a School Zone, in violation of 18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B); (3) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in

violation of 18 U.S.C. § 924(c)(1)(A)(i); and (4) Possession of Marijuana with Intent to Distribute Near a School, in violation of 21 U.S.C. §§ 841(b)(1)(D) and 860(a). (Dkt. No. 18).[1]

On July 9, 2019, Defendant filed a motion seeking to suppress all physical evidence seized and statements made in this matter. (Dkt. No. 26 at 1). During the subsequent suppression hearing, the Government presented the testimony of two witnesses from the Virgin Islands Police Department ("VIPD"): Lieutenant Cecil Gumbs ("Lt. Gumbs") and Officer Juan Bermudez ("Officer Bermudez"). The following evidence emerged from the testimony of the two witnesses.[2]

On October 31, 2018, Lt. Gumbs and Officer Bermudez were dispatched to Lorraine Village Apartments, Building 19, Apartment B, in Frederiksted, St. Croix, Virgin Islands. (Hr'g Tr. 6-7, 34). They were responding to a 911 call regarding a potential domestic dispute incident. *Id.* at 34. En route to Lorraine Village Apartments, the 911 dispatch operator ("dispatcher") notified Lt. Gumbs and Officer Bermudez that, while on the phone with the female caller ("Complainant"), she heard an argument in the background and heard a male inform the Complainant that he had a gun in his car. *Id.* at 13.

When Lt. Gumbs arrived at the parking lot of Lorraine Village Apartments, he was in full uniform and had been driving a marked police vehicle. *Id.* at 9-10. He saw Defendant, who he described as being very angry and irate, and asked him if he was okay. *Id* at 10. Defendant responded that, while everything was okay, he had just gotten into an argument with his girlfriend.

---

[1] Prior to filing the Amended Information, the Government commenced this action by filing a Criminal Complaint on February 27, 2019 and subsequently filing an Information on May 16, 2019. (Dkt. Nos. 1, 17).

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

*Id*. According to Lt. Gumbs, Defendant continued to act angry and irate and to pace back and forth, so he told him to calm down. *Id*. Lt. Gumbs then inquired about Defendant's vehicle, and Defendant told him that it was his mother's car and that she had allowed him to use it. *Id*. at 10-11. The vehicle's engine was running in the parking lot in front of Building 19. *Id*. at 15.

Meanwhile, Officer Bermudez was speaking with the Complainant, who advised him that she and her boyfriend had recently broken up and that she no longer required police assistance. *Id*. at 52. When Officer Bermudez met the other officers outside, Defendant was continuing to pace back and forth and Lt. Gumbs told him to stand still and stop moving. *Id*. at 11. Officer Bermudez testified that as Defendant was pacing, he appeared to "continuously walk[] toward Building 19 . . . where the female called for assistance." *Id*. at 35. Per Lt. Gumbs' instructions, Defendant sat on the police car. *Id*. at 11. However, Defendant soon got up and started cursing and pacing back and forth again, and at one point appeared to attempt to get inside his vehicle. *Id*. At that point, Lt. Gumbs directed Officer Bermudez to handcuff Defendant, telling Defendant: "For your safety and mine, I'm going to handcuff you. You're not under arrest, I'm just handcuffing you, and I'm going to detain you until we find out what was going on. Until we find out that the lady inside, the caller inside is safe." *Id*. at 11-12.

Officer Bermudez inquired as to whether Defendant had a weapon in his vehicle, and Defendant did not respond. *Id*. at 37. Then, Officer Bermudez asked for consent to search the vehicle and Defendant proceeded to execute a written consent to search form. *Id*. Lt. Gumbs testified that he loosened Defendant's handcuffs so that Defendant could sign the form with his free hand, and that he held Defendant's other arm to ensure that Defendant remained restrained. *Id*. at 15. Officer Bermudez testified that while he was walking toward the vehicle, Defendant stated that he had a firearm and ammunition in a camouflage bag on the right rear passenger seat

3

of the vehicle. *Id*. at 39-40. Members of the VIPD conducted a search of the vehicle and found a gun along with some other physical evidence. *Id*. at 15. Approximately two minutes passed between Defendant being handcuffed and the commencement of the search of his vehicle. *Id*. at 31. Throughout the entire encounter, there were approximately 5-6 officers at the scene. *Id*.

Subsequent to the search of his vehicle, Defendant was transported to the Wilbur H. Francis Police Station ("Police Station") for further investigation. *Id*. at 41. At the Police Station, Officer Bermudez read Defendant his *Miranda* rights and Defendant provided a two-minute videotaped statement regarding the events that led up to his arrest. *Id*. After Defendant concluded the statement, he was placed under arrest. *Id*.

In his Motion, Defendant seeks to suppress "the physical evidence seized and statements made in this matter." (Dkt. No. 26 at 1). Specifically, he "requests that the Court order the suppression of the firearm, cartridges, ammunition, magazines, ballistic vest, balaclava, and marijuana seized in connection with his arrest, as well as any and all statements made by [him] to law enforcement." *Id*.

## II. APPLICABLE LEGAL PRINCIPLES

### A. *Miranda* Custodial Interrogation and *Terry* Stops

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). Because the defendant must be both taken

into custody and subject to an interrogation to trigger *Miranda* warnings, "in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. 1997). The issue of custody turns on whether the defendant's freedom of movement was restrained to the "degree associated with a formal arrest" and whether the environment he was in simulated the "same inherently coercive pressures" that exist in a station house. *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999); *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court established the principle that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted). The Supreme Court has found that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010); *see also United States v. Lewis*, 2008 WL 2625634, at *6 (D.V.I. July 2, 2008) (finding that since the defendants were "initially detained pursuant to a lawful *Terry* stop . . . '[s]uch *Terry*-stops do not render a person in custody for purposes of *Miranda*.'") (quoting *United States v. Galberth*, 846 F.2d 983, 994 (5th Cir. 1988) (citations omitted), *cert. denied*, 488 U.S. 865 (1988)); *United States v. Denson*, 2006 WL 3144857, at *3 (W.D. Pa. Oct. 31, 2006) ("*Miranda* warnings are not required . . . during a valid *Terry* stop.") (citing *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 184 (2004)). Thus, in the context of a *Terry* stop, the fact that the officers "failed to give

antecedent *Miranda* warnings would not render their subsequent questions impermissible." *United States v. Bennett*, 2000 WL 1358480, at *8 (E.D. Pa. Sept. 20, 2000).[3]

In determining the legality of an alleged *Terry* stop, courts determine "whether the officer's action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. *Terry*, 392 U.S. at 20. It is well established that "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Because "probable cause means a fair probability that contraband or evidence of a crime will be found, the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330).

"A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, the police officer must demonstrate that the stop was based on something more than an "inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (internal quotation marks omitted). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "An officer

---

[3] "There is no question that a *Terry* stop constitutes a seizure," *United States v. Ford*, 2010 WL 2305868, at *3 n.2 (D.V.I. June 4, 2010) (citing *United States v. Edwards*, 53 F.3d 616, 620 (3d Cir. 1995) ("Clearly, a *Terry* stop is a seizure . . . and one seized is by definition not free to leave.")). However, it is deemed a legally permissible warrantless seizure as long as "the intrusiveness of the stop [does not] exceed[] the level of suspicion supporting the stop." *Ford*, 2010 WL 2305868 at *3 n.2 (citing *Edwards*, 53 F.3d at 619 ("Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.") (internal citation and quotation marks omitted)).

cannot conduct a *Terry* stop simply because criminal activity is afoot. Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) (internal citation omitted). In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. at 500. Thus, a *Terry* stop initially justified by reasonable suspicion may turn into a de facto arrest requiring probable cause "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)).

During a *Terry* stop, a "'person may be briefly detained against his will while pertinent questions are directed to him.'" *Kolender v. Lawson*, 461 U.S. 352, 364 (1983) (quoting *Terry*, 392 at 34) (White, J., concurring). Officers "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). These questions may be asked in a manner that is "calculated to obtain an answer . . . [b]ut they may not *compel* an answer." *Kolender*, 461 U.S. at 366 (Brennan, J., concurring) (emphasis in original). The subject of a *Terry* stop does not need to "answer any question put to him; indeed, he may decline to listen to the questions at all . . . ." *Royer*, 460 U.S. 491, 498 (1983). "Where an individual has been detained . . . and officers'

7

questioning stays within the bounds of questioning permitted during a *Terry* stop," *Miranda* warnings are not required. *United States v. Davis*, 530 F.3d 1069, 1081 (9th Cir. 2008).

### B. Voluntariness of Defendant's Consent and Statements

The Supreme Court has long established that "the search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States v. Matlock*, 415 U.S. 164, 165-66 (1974). When an individual gives valid consent to search his property, "any evidence discovered during such a search may be seized and admitted at trial." *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994). To justify a warrantless search based on consent, a defendant's consent must have been given "freely and voluntarily." *United States v. Price,* 558 F.3d 270, 277 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (internal quotation marks omitted)); *see also Matlock*, 415 U.S. at 177; *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989), *cert. denied*, 494 U.S. 1017 (1990). The determination of whether a consent to search was made voluntarily is based on analyzing the "totality of the circumstances. . . .'" *Price*, 558 F.3d at 278; *see also United States v. Ortiz*, 483 F. App'x 712, 716 (3d Cir. 2012) (same). Factors for the Court to consider include: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Price*, 558 F.3d at 278. The Third Circuit has also identified that "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions" is relevant. *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003).

Similarly, to determine the voluntariness of a statement, a court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). "[A] statement is involuntary when the suspect's will was overborne in

such a way as to render his confession the product of coercion." *United States v. Latz*, 162 Fed. App'x 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (internal quotation marks omitted). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108 (internal citation omitted). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id*.

### III. DISCUSSION

Defendant's argument with respect to alleged *Miranda* violations is twofold. First, Defendant argues that he was in custody and interrogated prior to being given his *Miranda* warnings. (Dkt. No. 26 at 2-4). He maintains that he was in custody for *Miranda* purposes because he was informed that he was being detained and was handcuffed. (Dkt. No. 26 at 4). Second, Defendant asserts that his subsequent videotaped statement to Officer Bermudez, made after *Miranda* warnings were given, was tainted by the earlier interrogation. *Id*. at 6. Defendant contends that, as a result, all of the statements he made and evidence that the officers discovered as a result of his statements must be suppressed as the product of a coercive custodial interrogation. *Id*. at 7.

The Government counters that Defendant was neither taken into custody nor interrogated for purposes of *Miranda*. (Dkt. No. 29 at 3-7). Instead, it is the Government's position that the Defendant was subject to a *Terry* stop, rather than custodial interrogation that triggers *Miranda*. *Id*. at 4.

Based on the totality of the circumstances, the Court concludes that Defendant was subject to a *Terry* stop and was therefore not in custody or interrogated for purposes of *Miranda*.

A.   *Terry* Stop

1.   **The Detention of Defendant**

The Court finds that Defendant's detention constituted a *Terry* investigatory stop because the officers had at least reasonable suspicion—based on what the dispatcher told them and on their own observations of Defendant—that Defendant was engaged in criminal activity. Specifically, at the suppression hearing, the officers testified to the call from the dispatcher together with various observations they made which allowed them to "articulate more than an 'inchoate and unparticularized suspicion or hunch'" that Defendant was engaged in criminal activity, and further that detention was necessary in order to ensure the safety of the officers, Defendant, and the public. *Ubiles*, 224 F.3d at 217 (quoting *Terry*, 392 U.S. at 27).[4]

The evidence showed that Lt. Gumbs was responding to a call regarding a domestic dispute; he was told by the dispatcher that a male was overheard informing the Complainant in the middle of an argument that he had a gun in his car; upon arrival on the scene, Defendant told Lt. Gumbs that he had gotten into an argument with his girlfriend; Defendant was cursing and acting angry and irate despite Lt. Gumbs' attempts to calm him down; Defendant continued pacing back and forth and walked in the direction of Complainant's apartment after being directed not to do so; and at one point, Defendant appeared to attempt to get inside his vehicle while the engine was

---

[4] The Court also notes that although many *Terry* stops occur on the street or in a vehicle, they may take place at or near a residence. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("the [Fourth Amendment] exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* . . . ."); *see also United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007) (finding that a *Terry* stop can occur at a person's own residence, as long as seizure occurs outside the home and not inside the residence); *Denson*, 2006 WL 3144857, at *2-5 (finding valid a *Terry* stop of a defendant which occurred in another individual's residence who allowed officers inside).

running.[5] These facts, taken together, support the conclusion that law enforcement had at least the requisite reasonable suspicion to "stop," i.e., seize, Defendant for investigative purposes. *See, e.g., United States v. Abdallah*, 2015 WL 327388, at *4 (D.V.I. Jan. 26, 2015) (concluding that a justifiable *Terry* stop occurred when a detective heard about the defendant's alleged crime the night before; a 911 dispatcher informed him that a victim alerted 911 of the presence of a suspect of said crime; and the defendant fit the 911 dispatcher's description); *United States v. Clark*, 2019 WL 3456813, at *10 (D.V.I. July 30, 2019) (finding that the officers' continued presence on the defendant's property constituted a *Terry* stop because the officers testified to various observations they made at the defendant's property which allowed them to articulate more than an inchoate and unparticularized suspicion or hunch) (quotations and citations omitted).

Further, "[t]he conduct of a so-called *Terry* stop must be justified by the information known to the officer at the initiation of the stop and must be limited in scope by the circumstances that justified the interference in the first place." *United States v. Nichols*, 2015 WL 13344676, at *4 (E.D. Pa. Oct. 8, 2015) (citing *Royer*, 460 U.S. at 500). Here, the stop was justified by the report received by the officers of a potential domestic dispute incident where the male participant allegedly had access to a firearm, and by the officers' observations at the scene. The record also reflects that the actions that the officers took during the course of the stop were within the scope of the stop. The officers' actions focused on ensuring the safety of the Complainant, under

---

[5] Defendant argues that the Court should not credit Lt. Gumbs' testimony because the events occurred approximately a year before he testified, and Officer Bermudez's arrest report did not mention Defendant's angry or irate behavior. (Dkt. No 44. at 2-3). Contrary to Defendant's contention, the Court finds that the relatively short one-year time period between the incident and Lt. Gumbs' testimony is of no consequence. Admittedly, the fact that Lt. Gumbs' testimony included information that was not in the arrest report gives the Court pause. However, the Court dismisses this challenge to Lt. Gumbs' credibility as well because the arrest report was authored by a different officer and the Court finds that Lt. Gumbs' testimony was clear, consistent, and credible.

circumstances which included the alleged presence of a firearm. The Court finds no basis for concluding that the actions that the officers took went beyond what was necessary to confirm or dispel that Defendant was involved in a domestic dispute incident and had access to a gun. Similarly, there is no basis for concluding that the investigative detention was longer than necessary to "effectuate the purpose of the stop." *Royer*, 460 U.S. at 499.

Additionally, the officers did not employ investigative methods that were overly intrusive or that required unnecessary force. *Id*. Officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see Terry*, 392 U.S. at 23-24. Therefore, in certain situations, an officer might have to take "necessary measures" to "neutralize the threat of physical harm." *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 23). Sometimes, placing a defendant in handcuffs is that "necessary measure." *United States v. Rose*, 189 F. Supp. 3d 528, 542 n.13 (D.V.I. 2016). The "use of . . . handcuffs must be justified by the circumstances" that authorize an investigative detention in the first place. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995).

Here, Lt. Gumbs reasonably believed that handcuffing Defendant was necessary to ensure the safety of himself and others. While Lt. Gumbs testified that he was not absolutely certain that Defendant had a gun, he maintained that knowing that a gun was potentially involved escalated the situation. Lt. Gumbs also testified that it was necessary to handcuff Defendant for safety purposes because Defendant was disobeying orders; pacing back and forth; acting angry and irate; walking toward the Complainant's apartment; and seemingly attempting to get into his vehicle with the engine running—all while possibly having access to a gun. A Defendant acting aggressively and possibly having access to a weapon gives an officer a reasonable basis to believe

that placing him in handcuffs is a necessary measure to neutralize a threat of physical harm. *See United States v. Foster*, 891 F.3d 93, 107 (3d Cir. 2018) (finding that placing the defendant in handcuffs while confirming that he was not armed and dangerous was not outside the scope of a reasonable *Terry* stop); *see also United States v. Hawkins*, 280 F. App'x 117, 121 (3d Cir. 2008) (concluding that officers did not exceed *Terry*'s limitations when they handcuffed people they believed were armed and had fired a weapon into a residence).

In view of the foregoing, the Court finds that the Government has established by a preponderance of the evidence that Defendant's detention constituted a valid *Terry* stop.

### 2. The Questioning of Defendant

In his Motion to Suppress, Defendant also argues that he was interrogated in violation of *Miranda* while detained at Lorraine Village Apartments. (Dkt. No. 26 at 4-6). Defendant contends that his statements must be suppressed as the product of a coercive custodial interrogation. *Id.* at 7-8. Defendant also asserts that when he stated that there was a gun in his car, it was in response to a question that Officer Bermudez had asked. (Dkt. No. 41 at 10). The Government responds that because this was a *Terry* stop rather than an arrest, there was no custodial interrogation. (Dkt. No. 29 at 4).

Because the Court has concluded that Defendant was subject to a *Terry* stop, rather than *Miranda* custody, this issue turns on whether the questions the officers asked Defendant were appropriate under a *Terry* stop. The Court finds in the affirmative.

"[R]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop." *Royer*, 460 U.S. at 498. Thus, during a *Terry* stop, an officer may conduct an inquiry so long as it is "reasonably related in scope to the justification for [his] initiation." *Berkemer*, 468 U.S. at 439. This typically means that "the officer

13

may ask the detainee a moderate number of questions . . . to try to obtain information confirming or dispelling the officer's suspicions." *Id*. However, a suspect detained during a *Terry* stop "is not obliged to respond" to questions. *Berkemer*, 468 at 439.

During the course of the *Terry* stop, the officers asked Defendant where his car was, who it belonged to, and whether there was a gun in the car. The Court has already determined that the officers had knowledge of facts giving rise to a reasonable suspicion of criminal activity at the time of their encounter with Defendant. The questioning regarding Defendant's vehicle was "reasonably related . . . in scope to the justification" of the inquiry because it related to the officers' suspicion that Defendant had a gun in his vehicle. *United States v. Washington*, 957 F.2d 559, 564 (8th Cir. 1992) (concluding that a detective's question as to the ownership of a suitcase was appropriate under *Terry* where the detective had reasonable suspicion that the suitcase had contraband in it). Determining information relating to his vehicle, such as where it was and who it belonged to, would assist officers in confirming or dispelling their suspicion that Defendant had a gun in his vehicle.

Similarly, asking Defendant whether he had a gun in his vehicle was reasonable and sensible considering the justification for the stop. *United States v. Basher*, 629 F.3d 1161, 1166 (9th Cir. 2011) (finding that questions regarding a gun were within the scope of a *Terry* encounter because the officers were investigating a gun crime). Asking Defendant whether he had a gun in his vehicle was also "necessary to protect the [officers'] personal safety and maintain the status quo . . . ." *United States v. Boden*, 854 F.2d 983, 993 (7th Cir. 1988) (citations omitted); *United States v. Scott*, 2019 WL 6331656, at *11 (E.D. Pa. Oct. 30, 2019) (concluding that an officer

asking each handcuffed suspect where a gun was during a stop was appropriate under *Terry* in part because its purpose was to reduce a safety risk to the community).[6]

Defendant argues that his statement regarding the gun in the vehicle was made in response to Officer Bermudez's question concerning the same. The Court notes, however, that Defendant's acknowledgment that he had a gun in his vehicle did not occur immediately after Officer Bermudez asked him whether he had a gun in the car.[7] To the contrary, Defendant did not make the statement regarding the gun until after the officers had received consent to search his vehicle.[8] Thus, between Officer Bermudez's question and Defendant's statement were the intervening events of Officer Bermudez's request to search Defendant's vehicle; the loosening of Defendant's handcuffs so that he could sign the consent form; and the execution of the consent form. Moreover, Defendant's statement went much beyond Officer Bermudez's question as to whether Defendant had a gun in the vehicle. Specifically, Defendant stated that he had a firearm and ammunition in a camouflage bag on the right rear passenger seat of the vehicle. It appears, therefore, that Defendant's statement—with his spontaneous description of the bag in which the gun would be found, and where in the vehicle the bag was located—was not really in response to Officer Bermudez's question but rather in aid of the officers' search of the vehicle to which Defendant had already

---

[6] Additionally, Lt. Gumbs testified that he "might have" asked Defendant if he had any weapons on his person. (Hr'g Tr. 38). If Lt. Gumbs did, indeed, make such an inquiry, the Court finds that it was an appropriate question under *Terry* for the same reasons discussed above.

[7] As Defendant was detained during a *Terry* stop, he was "not obliged to respond" to questions. *Berkemer*, 468 at 439. Nor was he coerced into responding by law enforcement, as evidenced by the absence of persistent questioning by the officers. *See Kolender*, 461 U.S. at 352. Indeed, Defendant was asked whether he had a gun in his vehicle only once.

[8] Officer Bermudez had asked for consent to search Defendant's vehicle. An officer may ask for consent to search "based on a hunch, or indeed, on nothing at all." *United States v. White*, 80 F. App'x 230, 231 (3d Cir. 2003).

given consent. In any event, even if Officer Bermudez's question was the precipitating factor for the statement, the Court finds, as discussed above, that the question was permissible.

Based on the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that the questions that the officers asked Defendant were appropriate in the context of a *Terry* stop.

### B. Voluntariness of Consent to Search and Statements

Defendant alleges that Lt. Gumbs made false promises that rendered his statements and consent to search involuntary, in that he was told that he was being handcuffed until the officers confirmed that everything was okay, but that the officers continued to detain him even after the Complainant reported that everything was okay. (Dkt. No. 41 at 6). Defendant also claims that he was coerced into consenting to the search of his vehicle because of the number of police officers present at the scene and the fact that he was handcuffed. (Dkt. Nos. 26 at 6; 44 at 4-6). The Government argues that in "light of the surrounding circumstances and the entire course of police conduct," Defendant's statements and consent to search were not the product of police misconduct or coercion. (Dkt. Nos. 29 at 6; 43 at 4).

The relevant inquiry here is whether, under the totality of the circumstances, Defendant's will was overborne due to Lt. Gumbs' alleged promise. *Fenton*, 796 F.2d at 604. First, the Court finds that Lt. Gumbs' statement was not a promise or an implied promise because Lt. Gumbs was not engaging in a *quid pro quo* with Defendant. To the contrary, Lt. Gumbs was informing Defendant that he was being handcuffed for the safety of himself and others until the officers determined what was going on and confirmed that the Complainant was safe.

Further, even if Lt. Gumbs' statement could be construed as a "promise," he never "broke" said promise. Although the Complainant informed the officers that everything was "okay," the

officers had yet to confirm that everything was "okay" because the officers were aware that Defendant allegedly had a gun; Defendant was acting angry and irate; Defendant was not following Lt. Gumbs' orders; Defendant was seemingly attempting to re-enter the Complainant's apartment; and Defendant was apparently attempting to get into his vehicle. The determination as to whether everything was "okay" was for the officers to make, not the Complainant. Thus, there was no broken promise.

Finally, if a promise or an implied promise existed here, there is no "causal connection" shown between the alleged promise and Defendant's decision to declare that there was a gun in his vehicle or to sign the consent to search form. *United States v. Fraction*, 795 F.2d 12, 15 (3d Cir. 1986). Nor was Lt. Gumbs' alleged promise of the nature that would overcome a defendant's free will. *See, e.g., United States v. Walton*, 10 F.3d 1024, 1029-30 (3d Cir. 1993) (an agent's promise that the defendant could speak "off the cuff" would be understood by a suspect to mean that the defendant's statements would not be used against him, rendering confession involuntary); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) (an investigator's promise that a suspect would not be prosecuted if he played ball could be the kind of false promise that would overcome a suspect's free will); *United States v. Veilleux*, 846 F. Supp. 149, 154-55 (D.N.H. 1994) (confession held involuntary when a law enforcement agent told the defendant that nothing he said would be used against him).

The totality of the circumstances also shows that Defendant's statements and consent to search were voluntary. *Fenton*, 796 F.2d at 608. Defendant argues that the number of police officers at the scene and the fact that he was handcuffed rendered his consent and statements involuntary. While the Court credits the fact that throughout Defendant's encounter with law enforcement there were 5-6 officers present, and that Defendant was handcuffed, there is no

17

showing on the record that the officers' presence or the fact that Defendant was handcuffed created the kind of coercive environment that would render Defendant's consent or statements involuntary. *See United States v. Savage*, 2012 WL 5881852, at *6 (E.D. Pa. Nov. 20, 2012) (concluding that a conversation that "occurred in a law enforcement vehicle while [the defendant] was handcuffed did not render the environment inherently coercive."); *see also United States v. Kofsky*, 2007 WL 2480971, at *27 (E.D. Pa. Aug. 28, 2007) (finding that while the presence of 23 armed federal agents may function as one indicia of coercion, it "did not convert the interview of [the defendant] into a custodial interrogation."). Further, the setting where the interaction took place was the parking lot of Defendant's girlfriend's apartment, which also does not suggest that Defendant was in a coercive environment. *Givan*, 320 F.3d at 459; *United States v. Henry*, 2018 WL 6840149, at *6 (D.V.I. Dec. 31, 2018). There is also nothing on the record to suggest that Defendant's age, education, and intelligence would have impacted the voluntariness of Defendant's consent to search or his statements. *Price*, 558 F.3d at 278.

Additionally, although Defendant was handcuffed and Defendant was not yet advised of his constitutional rights, the questioning was not repeated nor was it prolonged. *Cf. United States v. Clark*, 2019 WL 3456813, at *12 (D.V.I. July 30, 2019) (concluding that the officers' repeated requests for consent to search "in the face of his repeated declinations resulted in [the defendant's] 'capitulation [that] was not the product of free will and voluntary consent) (quoting *United States v. Eberhart*, 1998 WL 34113374, at *4 (N.D. Iowa Oct. 9, 1998). In circumstances where law enforcement is attempting to obtain consent to search, courts have found that a lack of "repeated questioning" by the officers and the fact that the defendant responds to such requests to search with ready cooperation, or without hesitation or reluctance, support a finding of voluntariness. *See Kim*, 27 F.3d at 955 (finding defendant's consent to search voluntary where "there was no repeated

. . . questioning" and defendant was "cooperative" and "readily consented to the search," his demeanor exhibited no signs of "hesitation," and defendant was "not at all reluctant" to permit the search); *see also United States v. Martinez*, 460 F. App'x 190, 194 (3d Cir. 2012) (finding defendant's consent to search voluntary where, *inter alia*, his encounter with the police "lack[ed] . . . repeated questioning" and defendant gave an "immediate consent to the search"). Here, there is no evidence that Defendant was uncooperative or at all reluctant to permit the search. Instead, in view of the fact that only approximately two minutes passed between Defendant getting handcuffed and the officers beginning the search of his vehicle, it is apparent that Defendant readily consented to the search by immediately agreeing to it.

Based on the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that Defendant's consent to search and his statements made at Lorraine Village Apartments were voluntary.

### C. Defendant's Videotaped Statement

Defendant claims that the videotaped statement he gave at the Police Station after he was transported there and his *Miranda* rights were administered was tainted by the earlier interrogation. (Dkt. No. 26 at 6). In view of the Court's finding above that there was no improper interrogation or other illegality in the officers' conduct at Lorraine Village Apartments, there was no taint that could have infected the later Mirandized statement. Accordingly, the Court rejects Defendant's argument that the videotaped statement should be suppressed.

## IV. Conclusion

In view of the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that: (1) Defendant was subject to a valid *Terry* stop; (2) Defendant's statements and consent to search at Lorraine Village Apartments were voluntary; and (3) Defendant's Mirandized videotaped statement was not tainted by any illegality. Accordingly, Defendant's Motion to Suppress will be denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 10, 2020

_____/s/_____
WILMA A. LEWIS
Chief Judge